ROBERT G. MARCH, as Executor of and Trustee under the Will of PETER S. MARCH, Deceased, et al., Respondents, *v.* SETH S. MARCH et al., Appellants, and MARY M. M. KENNEDY et al., Respondents.

1. WILL — DEATH OF LEGATEE BEFORE PAYMENT OF LEGACY. A limitation over, to take effect in case of the death of a legatee before the conveyance and payment of the legacy, is effective if the legatee does not live to become entitled to it and to demand its payment or maintain an action therefor.

2. PRESUMPTION AS TO TESTATOR'S INTENTION. The presumption exists that a testator, in the absence of unfriendly relations between himself and his descendants, had the desire and intent that his property should go to his descendants rather than to strangers to his blood, and should be considered in the interpretation of his will.

3. LEGACY PASSES TO ISSUE OF DECEASED LEGATEE AND NOT TO HIS DEVISEES. A testamentary provision, "That in the event of the death of any of my children before the conveyance and payment to him of the share of my estate herein given to him; or of either of my children whose share of my estate is held in trust, that my Executors convey, pay and assign the share of the one so dying to his or her issue absolutely, and if he or she shall leave no issue, then that they convey, pay, assign and divide such share or the proceeds thereof to and among my surviving children and to the issue of any deceased child, such issue to take by representation the part or share his, her or their parents would have been entitled to, if living," is effective to vest in a grandchild that portion of the share of his father, who died after the testator, but before the executors, who, under the will, had discretionary power to sell the real estate, could, by the exercise of diligence and good faith, dispose of a portion of it situated in a foreign state and, therefore, were unable to pay over to the father his share of the proceeds of the sale.

*March* v. *March*, 104 App. Div. 630, affirmed.

(Argued May 2, 1906; decided October 2, 1906.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered May 26, 1905, which affirmed a judgment of Special Term construing the will of Peter S. March, deceased.

The facts, so far as material, are stated in the opinion.

*William B. Hornblower* for appellants. The phrase contained in the 4th clause of paragraph 5 of the will, "in the event of the death of any of my children before the conveyance and payment to him of the share of my estate herein given to him," is not to be construed as referring to the physical facts of conveyance and payment, but to the accruing of the right to conveyance and payment as theretofore provided by the 3d clause of paragraph 5. (*Underwood* v. *Curtis*, 127 N. Y. 523; *Watkins* v. *Reynolds*, 123 N. Y. 211; *Campbell* v. *Stokes*, 142 N. Y. 23; *O'Donoghue* v. *Boies*, 159 N. Y. 97; *Roseboom* v. *Roseboom*, 81 N. Y. 356; *Matter of Peters*, 69 App. Div. 465; *Freeman* v. *Coit*, 96 N. Y. 63; *Banzer* v. *Banzer*, 156 N. Y. 429; *Washbon* v. *Cope*, 144 N. Y. 287; *Byrnes* v. *Stilwell*, 103 N. Y. 453.)

*Mornay Williams* for defendants, respondents. The time of sale was left to the discretion of the executors, and that discretion cannot be interfered with. (*Haight* v. *Brisbin*, 96 N. Y. 132.) The discretion was absolute, and as the distribution, conveyance or payment of shares was not to be made until after a sale, the executors were entitled to delay the sale, and consequently the distribution, to such time as they saw fit. (*Hancock* v. *Meeker*, 95 N. Y. 528; *Elwin* v. *Elwin*, 8 Ves. 547.) Frank P. March having died before the time when the distribution could be made, or, in other words, before the time when the whole of the bequest to him was payable, the effect of the 4th subdivision of clause 5 was to defeat such bequest, as far as the same was not payable before his death, and to vest in his daughter the portion of the share not payable to her father. (*Johnson* v. *Crook*, L. R. [12 Ch.] 639; *Whitman* v. *Aitken*, L. R. [2 Eq.] 414;

*Hutchins* v. *Mannington*, 1 Ves. 366; *Martin* v. *Martin*, L. R. [2 Eq.] 404; *Matter of Chaston*, 50 L. J. [Ch.] 716.)

HAIGHT, J. This action was brought to obtain a construction of the last will and testament of Peter S. March, who died in the city of New York on the 11th day of February, 1899. The questions about which the parties differ arise under the fifth clause of the will, which provides as follows:

"*Fifth.* I give, devise and bequeath all the rest, residue and remainder of my estate and property, as well real as personal, of which I shall die seized, possessed or entitled and wheresoever situate, To my Executors and Trustees hereinafter named and to the survivors and survivor of them In Trust for the uses and purposes following:

"1. That my Executors and Trustees sell, convey and dispose of the same at public or private sale at such times and on such terms as they may think proper.

"2. That my Executors and Trustees invest and keep invested during the life of my wife one-third part of such residue of my estate, or the proceeds thereof, and pay or apply the rents, interest and income thereof to the use of my wife so long as she shall live.

"3. That my Executors and Trustees divide the remainder of such residue (and on the death of my wife the one-third part held for her benefit) into six equal parts or shares, and convey, pay and assign one of such shares to my son Edwin P. March, first deducting the said sum of fifteen thousand dollars as herein directed; that they convey, pay and assign one other of such shares to each of my sons, Frank P. March and Egbert G. March, absolutely; that my Executors and Trustees set aside and designate one of the remaining three shares for each of my daughters, Virginia A. March and Laura J. Adams, and son, Seth S. March; and hold, invest and keep invested the share of each child last named during his or her life, and collect and receive and pay or apply the rents, interest and income of the share of each child to the use of such child during his or her life, and upon the further trust,

"4. That in the event of the death of any of my children before the conveyance and payment to him of the share of my estate herein given to him; or of either of my children whose share of my estate is held in trust, that my Executors convey, pay and assign the share of the one so dying to his or her issue absolutely, and if he or she shall leave no issue, then that they convey, pay, assign and divide such share or the proceeds thereof to and among my surviving children and to the issue of any deceased child, such issue to take by representation the part or share his, her or their parents would have been entitled to, if living."

The testator's wife predeceased him. His son Frank P. March died on the 10th day of May, 1900, leaving him surviving a widow, from whom he had been separated in his lifetime, and a daughter, Mary McIlvaine March, now Kennedy, his only heir at law and next of kin, whom he disinherited by his last will and testament. The testator, Peter S. March, died possessed of both real and personal property. As to his personal property, it was administered by his executors during the lifetime of Frank P. March, and his share thereof was paid over to him. After his death the trustees sold a parcel of the testator's real property, in Norfolk, Va., receiving therefor the sum of $150,000, which is now in the hands of the plaintiffs, subject to distribution under the provisions of the will; and the question is as to whether the share thereof which Frank would have been entitled to had he lived, passes under his will to his legatees and devisees, or goes to his daughter, Mary McIlvaine, under the will of her grandfather, Peter S. March. The answer to this question depends upon the construction to be given to subdivision 4 of the fifth clause of the will, which, as we have seen, provides that, in the event of the death of any of the testator's children before the conveyance and payment to him of his share of the testator's estate, such share shall be conveyed and paid over to his issue absolutely. It is not contended that this provision of the will is illegal, that it is violative of any statute or common law, or that it is against public policy. The only question is,

what did the testator intend. In ascertaining such intention we are required to take into consideration the surrounding circumstances under which he framed the provisions of the will, the situation of his estate and of the members of his family whom he wished to be the recipients of his bounty. (*Williams* v. *Jones,* 166 N. Y. 522–532.) In considering these circumstances for the purpose of ascertaining the intention of the testator, there is a presumption which we must bear in mind, and that is that in the absence of unfriendly relations existing between testators and their descendants, there almost invariably exists a desire and an intention on the part of testators that their property should go to their descendants, rather than to strangers to their blood.

Upon referring to the findings of fact it appears that the testator was possessed of a personal estate, amounting to the sum of $230,000 over and above his liabilities; that he also was possessed of the real property in Virginia, from which the sum of $150,000 has been derived upon its sale; that he had a wife and six children, four boys and two girls, all of whom were adults; that one son, Frank P., and one daughter, Laura J., had married; that Laura J. had no children, but Frank P. had a daughter, Mary McIlvaine, who appears to have been the only surviving grandchild of the testator. It does not appear that any trouble had occurred between Frank and his wife or daughter at the time the will in question was executed, or during the lifetime of the testator. These are the circumstances under which we are called upon to determine the intention of the testator and ascertain whether he has disinherited his grandchild. In so far as the testator created a trust in favor of his wife, it appears that he survived her, and, therefore, that provision, upon his death, became of no force or effect and may be disregarded. We then have remaining a gift and devise of all the residue and remainder of his estate, both real and personal, to the executors and trustees named in his will for the purpose of establishing three separate trusts, one in favor of each of his daughters and the other in favor of his son Seth S. March,

to continue during their respective lives, to each of which trusts was given one-sixth of his residuary estate; the other three-sixths were directed to be conveyed and paid over to his three sons, Edwin, Frank and Egbert. Then we have the provision, " That in the event of the death of any of my children before the *conveyance* and *payment* to him of the share of my estate herein given to him, or of either of my children whose share of my estate is held in trust, that my executors convey, pay and assign the share of the one so dying to his or her issue absolutely, and if he or she shall leave no issue then that they convey, pay, assign and divide such share or the proceeds thereof to and among my surviving children," etc. The personal estate, as we have seen, had been administered by the executors, the debts paid and the amount due Frank paid over to him during his lifetime. We have, therefore, only to consider the real estate. This the executors and trustees were directed to sell at public or private sale and at such times and on such terms as they might think proper. This provision was doubtless mandatory and operated to convert realty into personalty. (*Lent* v. *Howard*, 89 N. Y. 169; *Hope* v. *Brewer*, 136 N. Y. 126–134.) But this does not affect the discretionary power given as to the terms and time of the sale. When the sale was made and the proceeds received it became the duty of the trustees to set apart three-sixths thereof for the benefit of the three trusts created in favor of the two daughters and the son Seth, and to pay the other three-sixths thereof to the other son. The executors and trustees, it appears, did proceed and sell the Virginia property. It is found as a fact and conceded upon the argument that such sale was made in good faith by the executors and trustees, and at the earliest date at which it could properly have been made. But at the time the sale was made Frank had died, leaving his daughter, Mary McIlvaine, his only surviving issue. Referring again to the provisions quoted we find two distinct classes referred to. The first embraces any of his children dying before the conveyance and payment to him of his share of the estate, clearly meaning the three sons, who were entitled

to their shares after the sale and conveyance of the real estate had been made; and the other to either of his children dying, whose share of his estate had been placed in trust, thus including the two daughters and his son Seth. So that in case of the death of any of the sons whose estates were not in trust before the conveyance and payment to them, or in case of the death of either of the children whose estates had been put in trust, the direction was to pay and assign the share of the child so dying to his or her issue absolutely. To my mind there is no possible doubt but that the testator intended that the fund should go to his grandchild. Indeed, I cannot see how more clear and concise language could have been used expressive of such intent, and none has been suggested. While it seems to be conceded that the language used, literally construed, would signify actual payment, yet it is contended that such a construction would be so unreasonable that the courts ought not to adopt it, unless the intention of the testator has been expressed in language so clear and positive as to leave no room for possible doubt; that the objections to a literal interpretation are that it would not only leave the testator's bounty subject to accident which he could in no manner foresee, but also empower those intrusted with the execution of his will to vary or change its provisions at their own pleasure. My answer to this is that a testator's bounty is always subject to accident until it reaches the possession of the person for whom it was intended. If personal property, it may be lost, stolen by thieves, or destroyed by fire; but none of these accidents could affect the intention of the testator or the construction that should be given to his will. Every person is liable to die, and no testator can foresee the time or manner of the death of a devisee or legatee. The death of such a person may change a testator's property from one channel into another, but how could this affect the original purpose or intent of any particular testator. Finally, it is urged that if actual physical payment of the fund into the hands of the legatee is necessary, then the executor might, through litigation or otherwise, postpone the payment until after the

death of the legatee and thus divert the legacy into another channel. But no one contends that actual physical payment of the fund into the hands of the legatee is necessary. That is not the question here presented. Of course, executors and administrators cannot change the rights of parties by improper litigation. No such question has been presented in this case. The executors and trustees have acted in good faith, have sold the real estate and converted it into money as soon as it was possible or proper for them to do so, and have fully performed their duty in that regard, as has been found and conceded in this case. If they had not performed their duty in that regard, Frank, during his lifetime, had his remedy to enforce such performance. The question in this case is, when did the fund become due and payable to Frank; when could he have maintained an action against the trustees to recover his share of the proceeds of the real estate. Under the will they were required to sell at such times and on such terms as was proper. The fund derived from the sale was then to be distributed in the manner specified in the will. It was then that Frank's share became due and payable; then he was entitled to have it in possession; then he could have maintained an action to recover it. But when that time arrived, as we have seen, he had died, and under the terms of the will his right thereto passed to his only surviving child.

In construing wills the rule is that we should consider all of the provisions, and, so far as possible, construe each in harmony with the others, giving force and effect to all. Applying this rule to the provisions of subdivision 4 of the will we are required to give force and effect to the first provision, which has reference to the death of the three sons before the conveyance and payment to them of their share of the estate, as well as to give force and effect to the second provision, which relates to the death of those children whose estate is by the terms of the will put in trust. If, however, we are to adopt the contention of the appellants, it follows that the first provision must be eliminated and entirely dis-

regarded as having no force and effect whatever.   To avoid such a violation of the rule of construction it is now suggested that the death of any of the children therein referred to meant death within the lifetime of the testator.   Not so. The provision does not so state and cannot be so read. The executors and trustees had no power in the lifetime of the testator to sell and convey his real estate, or to pay over the proceeds of such sale to the beneficiaries until after his death and the will had been admitted to probate.   The death referred to, therefore, must have been a death after that of the testator and before the "conveyance and payment" to such child of his share of the estate.   His share of the estate could not be determined until the sale had been made, the proceeds collected, and the amount ascertained, at which time it became due and payable, and not until then.   The death referred to was the death of a child occurring "before" the happening of such sale, not before the death of the testator. If it referred to a death during the lifetime of the testator, then it would logically follow that it meant the same thing with reference to the second provision, pertaining to the estates of the three children for whom trusts were created, a construction which no one so far has contended for as proper. If such were its meaning, then the clause would be meaningless and of no force or effect; for under the statute a legacy payable to a child of the testator does not lapse by reason of his death before that of the testator, where he has children living who can take in his place.

While conceding that the words used in the will, literally construed, would signify actual payment and indicate an intent on the part of the testator that upon the death of Frank before such payment his share should go to his child, it is contended that such literal construction ought to be rejected for the reason that Lord THURLOW over a century ago said : "Suppose he had given a real estate in the manner you specify, it is clear that it will neither depend upon the caprice of the trustee to sell, for that would be contrary to all common sense, nor upon his dilatoriness.   In some way it

may be sold immediately, but I should not inquire when a real estate might have been sold with all possible diligence." This quotation is to be found in the case of *Hutcheon* v. *Mannington* (1 Ves. 366). In that case Hutcheon died in the East Indies possessed of a personal estate amounting to the sum of £8,627. By his will he gave certain legacies to his brothers and sisters and to his father, the will containing a provision that in case of the death of either of them before receiving the legacy, it should go to the children of the legatee so dying. The father died after the testator, but before he had received his legacy. It was claimed that inasmuch as the personal estate was in the East Indies it did not vest until sufficient time had elapsed to transport the same to England. With reference to this the lord chancellor said: "I rather believe he had some such purpose as you attribute to him, in his contemplation. There is a faint indication of a purpose, that there shall be some time or other when these interests shall go over, and that they shall not vest in the meantime. But has he conceived that intention and expressed it with such definite certainty that I can act upon it? I am to compute what time would be sufficient to enable these parties to receive their legacies. It is all too uncertain." He concluded by holding that they vested on the death of the testator. In the case of *McKinstry* v. *Sanders* (2 T. & C. 181) the will of the testator provided that his real and personal estate should be converted into cash and a certain legacy paid; that if there was any surplus remaining it should be paid over to his nephews and nieces "who shall then be living to be equally divided between them." After the testator's death two nieces died before final distribution, and it was held that the provision "who shall be living," meant the nephews and nieces who were living at the time of the testator's death, and that their interest became vested as of that date. This is in accord with a number of decisions in this court, and the correctness of the conclusion is not questioned. But it will be observed that it has no application to the question under consideration, for

there is no provision in the will divesting the nephews and nieces, or either of them, of their share in the estate by their death after that of the testator and before final payment. In *Finley* v. *Bent* (95 N. Y. 364) the testator, after making certain provisions for his wife, devised and bequeathed all the residue of his estate, both real and personal, to his executors in trust, with directions to sell and dispose of his real estate as soon as they conveniently could after his decease, and then divide the proceeds into three shares, one for each of his three children, and to invest the shares separately upon bond and mortgage on real estate, or in interest-bearing securities of the state of New York or of the United States. At the expiration of one year from the death of the testator each child was to be paid out of the principal of his or her share the sum of $7,000, at the expiration of two years the sum of $5,000, and at the expiration of five years the balance of his or her respective shares. The will then provided that, "Should either of my children die before the full payment of the whole of his or her share of such residue, then my executors shall pay the share of the child so dying, or so much thereof as shall remain unpaid, to his or her lawful issue then surviving." One of the daughters died after the expiration of five years, leaving a husband and an infant son. At the time of her death a portion of the real estate had not been converted into money. It was held that inasmuch as the will fixed a definite period, to wit, five years, from the death of the testator when she should be paid the balance of her estate, it became due and payable as of that date, and was, therefore, in the law deemed absolutely vested in her, and that the provision of the will containing a provision with reference to her death before full payment meant a death before the expiration of the five years, the time fixed in which her share became finally due and payable. This case I shall have occasion to refer to later on. These are the cases upon which it is contended that we are concluded by authority from giving to the language used in the

will the literal meaning which the testator evidently intended, thus preventing the estate from going to his grandchild.

In the case of *Gaskell* v. *Harman* (11 Ves. 489–496) the chancellor, Lord ELDON, in commenting upon the conclusion reached by Lord THURLOW in *Hutcheon* v. *Mannington*, admitted that he differed from the conclusion reached by his lordship as to the construction given to the will, and that he entertained the view that the natural construction was to the effect that if the legatee should die before the property should be actually paid to him the gift over would take effect. But he considered the case as an authority to the effect that the language used must be clear and specific, asserting the soundness of the proposition that " If a testator thinks proper, whether prudently or not, to say distinctly, showing a manifest intention, that his legatees, pecuniary or residuary, shall not have the legacies, or the residue, unless they live to receive them in hard money, there is no rule against such intention if clearly expressed." And to the same effect is the case of *Law* v. *Thompson* (4 Russ. 92–100). In *Johnson* v. *Crook* (L. R. [12 Ch. Div.] 639) the testatrix had by her will made certain provisions for Thomas Keeling and Joseph Gill and then concluded: " But in case the said Thomas Keeling shall depart this life before he shall actually have received the whole of his share of the said residuary moneys, effects and premises, and without leaving any issue of his body living at his decease or born in due time after, then and in such case, and whether the same shall have become payable or not, I direct, limit or appoint that his share of and in all the aforesaid residuary moneys, effects and premises, or (as the case may be) such part and parts thereof as he shall not have actually received as aforesaid, shall be paid, assigned and transferred unto the said Joseph Gill, his executors, administrators and assigns." Joseph Gill died in 1847. Thomas Keeling died in 1850, without ever having been married, and before receiving his share of the residuary estate. The controversy arose between the executors of their respective estates. JESSEL, Master of the Rolls, reached the conclusion that the provisions of the will

were clear and specific, and that "actually received" meant
"actually received;" and that there was no statute law or
common law which prevented the carrying out of the inten-
tion of the testatrix; and that, "if there was anything to pre-
vent it, it must be found in some law manufactured by the
judges in the equity jurisdiction;" and after a consideration
of all the cases bearing upon that subject, including the
opinion of Lord THURLOW, above alluded to, he reached the fol-
lowing conclusion with reference thereto : " I should now be
establishing a new law applicable to wills if I refused to give
the natural interpretation to these words which are so plain
and clear as not to be the fair subject of controversy." He,
therefore, held that the interest of Keeling upon his death
was given over to Gill, or to his executors, administrators and
assigns.    In *In re Wilkins* (*Spencer* v. *Duckworth*, L. R. [18
Ch. Div.] 634) the testator, Wilkins, gave his residuary estate to
four persons, to be equally divided between them, with a pro-
vision that in case either die before the final division of the
estate his share should go to his children.    Two of the legatees
died more than a year after the death of the testator.    The
estate had not then been fully distributed.    It was held that
under the practice of the court twelve months were allowed
after the death of the testator in which the executors were
required to wind up his affairs, pay his debts and distribute
his estate ; that in so far as the two deceased legatees survived
that period, their shares became due and payable, and, there-
fore, the legacy did not go over on their subsequent death.
FRY, J., however, in delivering his opinion, expressly concurs
in the views of the master of rolls, as expressed in the case
of *Johnson* v. *Crook* (*supra*).    In *Sampson* v. *Sampson* (L. R.
[1 Ch. Div. 1896] 630), after referring to the cases in which
there has occurred a gift over on the death of a legatee before
actually receiving his legacy, STERLING, J., says: "These
cases are not entirely consistent among themselves ; but this
at least they establish — that whether or not a testator can
effectually cause a vested gift to be divested before it has
actually come to the hands of the legatee, such an intention

ought not to be attributed where the words are not clear;
and in cases where the words are susceptible of such an
interpretation, the court has held that the period over which
the operation of a divesting clause of this kind is to extend
ought not to be held to continue beyond that at which the
legacy is *de jure receivable.*"   In *Whitman* v. *Aitken* (L. R.
[2 Eq.] 414) the testator bequeathed to his nephew, David
Maxwell Aitken, £2,000, "and in case of his death before the
same shall be actually paid or payable to him, then the
trustees or trustee for the time being of this my will shall
stand possessed thereof, or the securities whereon the same
shall be invested, in trust for all the children of the said
David Maxwell Aitken, whether born in my lifetime or after
my decease, who being a son shall attain the age of twenty-
one years, or being a daughter or daughters shall attain that
age or marry, in equal shares or proportions, and in case there
shall be only one such child, then for such one child, and in
case no child of the said D. M. Aitken shall acquire a vested
interest, then in trust in like manner for all the children of my
nephew, J. M. Kitson Aitken."   David Maxwell Aitken did die
after the testator, and before any part of the £2,000 had been
paid over to him or appropriated for that purpose from the
estate, leaving an infant daughter.   In that case the same claim
was made, as in this case, that the legacy became vested in
David Maxwell as upon the death of the testator.   Sir J.
STEWART, V. C., in his opinion, said, with reference thereto,
that: "Where the language is ambiguous the court will
undoubtedly look to the context to ascertain the testator's
meaning, and even where the words are clear in themselves
they may be controlled by the context.   But the first rule of
construction is, that where the language of the testator is
clear, and involves no inconsistency or contradiction with
other parts of the will, those clear words must prevail.   In
this case the literal meaning is perfectly plain and rational,
and must have its due effect.   The gift is to D. M. Aitken,
but if he dies before it is actually paid or payable, then the
property is to be held for his children.   It is admitted that

the legacy was not paid. Then what is the meaning of the word payable? That refers to the death of D. M. Aitken in the lifetime of the testator. It is, therefore, plain that there were two events, upon the happening of either of which the gift to the children was to take effect. If D. M. Aitken should die in the lifetime of the testator the legacy is not payable, and his children are to take it. If he survives the testator, but dies before the legacy is actually paid to him, his children are to take." In *Goulder* v. *Goulder* (L. R. [2 Ch. Div. 1905] 100) the testator in his will made provisions for his brother John, with a proviso that in the event of his brother "being unable at the time of my decease, *or at any time prior to the actual payment to him of his share*, or any part of his share on the division of my estate, to give a receipt to my trustees for his share by reason of his having committed or suffered any act whereby he has deprived himself of the right to the benefit of such share, either in whole or in part, then I direct my trustees to stand possessed of the share of such brother, or that part of such share which my said brother is unable to receive for his own benefit upon trust for the brother's children." When the estate became ready for distribution the brother had been adjudged a bankrupt and a trustee appointed who claimed the fund. It was held, however, that the words "prior to the actual payment" should be read literally, and that the share which the brother was then unable to receive was given over to his children, approving of the case of *Johnson* v. *Crook* and the other cases in accord therewith. So much for the English authorities upon the subject.

In *Tyson* v. *Blake* (22 N. Y. 558) the testator, after providing for the payment of debts, etc., gave the whole of his estate to his four grandchildren in equal shares. As to Emeline, one of them, he provided that in case she should die without lawful issue, her share should go to the other three. COMSTOCK, Ch. J., says that "Emeline, therefore, took under this will more than a life estate. If she had left children they would have taken, not as legatees of the testator, because nothing was given to them, but in succession to their mother

8

and according to the laws of distribution; in other words, as
her next of kin. But a general bequest of personal estate,
like a fee in lands, can be subjected to a limitation over on
a condition which is not too remote. If the direction is that
it shall go to another beneficiary, on a contingency which
must happen at the death of the first taker, the limitation is
within the rules of the law and will be sustained." In the
case of *Vanderzee* v. *Slingerland* (103 N. Y. 47) the testator,
by the second clause of his will, gave to his son, Cornelius, all
his real estate situate in the county of Albany. By the tenth
clause of his will he provided: " In conclusion, my will is
that if my son, Cornelius, dies without issue, that then the
estate herein devised to him shall go over to my grandchil-
dren," specifically naming them, " * * * and in case my
son, Cornelius, should die before the provisions of this will
become an act, the devisees last named shall perform and
fulfill all the conditions required of my son, Cornelius, to the
legatees named in this my will." Cornelius survived the
testator, and subsequently died without issue. It was claimed
that the death of Cornelius, referred to in the will, was a
death occurring during the lifetime of the testator, and that
he, having survived the testator, took a fee absolute in the
estate devised to him. ANDREWS, J., in delivering the opin-
ion of the court, conceded the rule to be, that where a
bequest is simply to one person and in case of his death
to another, the primary devisee surviving the testator takes
absolutely; that this rule applies both to real and personal
estate. But it was a question of intention, and the rule thus
referred to " applies only where the context of the will is
silent, and affords no indication of intention other than that
disclosed by words of absolute gift, followed by a gift over
in case of death, or of death without issue or other specified
event. Indeed, the tendency is to lay hold of *slight circum-
stances* in the will, to vary construction and to give effect to
the language according to its natural import." He con-
cluded by holding that the words " die without issue " referred
to a death at any time, whether before or after the death of

the testator; that Cornelius took a conditional fee, and the grandchildren a contingent interest by way of executory devise, which, upon the happening of the contingency provided for, the death of Cornelius without issue, their contingent interest was converted into a fee. To the same effect is *Nellis* v. *Nellis* (99 N. Y. 505); *Buel* v. *Southwick* (70 N. Y. 581); *Hennessy* v. *Patterson* (85 N. Y. 91); *Matter of Cramer* (170 N. Y. 271). In *Matter of Wiley* (111 App. Div. 590) the will devised the residuary estate to the testator's wife and to specifically named sisters, nephews and nieces, share and share alike; and then provided that, in case of the death of either before the whole estate shall be divided, it shall be distributed among the survivors only, share and share alike. One of the nephews was killed after the death of the testator and before any part of the residuary estate had been divided by the executors among the residuary legatees. It was held that he having died before the period of distribution arrived, the limitation over took effect.

The only other case to which I wish to specially refer is that of *Finley* v. *Bent* (95 N. Y. 364), to which I have already alluded, stating the facts and the holding with reference thereto. This is the case to which the chief judge refers when he says that we are concluded by authority. The effect that is to be given to this case is, I apprehend, our chief point of difference. As we have seen, the share of the estate in controversy was payable to a daughter in one, two and five years from the testator's death. At the expiration of five years her entire share became due and payable. The testator had given the executors what he deemed ample time in which to sell and dispose of his real estate, in order to meet and pay the legacies as they matured and became due. At the expiration of five years this daughter was alive. She had the right to have her share paid over to her and could have maintained an action therefor. It, therefore, became absolutely vested in her, and upon her subsequent death it passed to her legal representatives. This was in accord with *In re Wilkins* (L. R. [18 Ch. Div.] 634), to which I have referred, in which the

legatees were entitled to their legacies one year after the death of the testator, and having survived that period their shares became due and payable, and, therefore, did not go over on their subsequent death. But that is not the question which we are called upon to determine. The question presented by this case is as to the effect of the death before the legacy becomes due and payable, before the time that the legatee has the right to demand its payment or maintain an action therefor. This question was considered by Earl, J., in the case of *Finley* v. *Bent.* He says: "It is conceded that the direction contained in the will to the executors, to sell the real estate, operated as a conversion thereof into personalty, and hence for the purposes of this will, and its construction, and the devolution of the estate, it must be treated as personalty from the time of the testator's death. It is clear, from the language used, that the shares given to the children vested at once upon the death of the testator. The remainder of the proceeds of the residue of the real and personal estate was without delay, after the death of the testator, to be divided into three shares, one for each of his children. * * * But each share was *liable to be divested,* as to so much of the share as within the meaning of the will remained unpaid, in case of death before full payment." He then refers to the claim of the appellant with reference to the words "die before full payment," meaning before actual full payment, and then he said with reference thereto: "If that be the meaning, then within the case of *Johnson* v. *Crook* (L. R. [12 Ch. Div.] 639), the contention of the appellant *is sound,* and the share upon the death of Abby passed under the will to her son." He then proceeds to show that the meaning of the words "die before full payment" mean "before the share becomes payable; and, therefore, inasmuch as the daughter died after the whole share was payable, the share was not divested, and passed as part of her estate." In other words, if the daughter had died before the five years had expired, at which time the share became due and payable, the share would have divested and passed under the will of her father to her son. It, therefore,

appears to me that this case is an authority in support of the judgment we have under review. (*Hoadly* v. *Wood*, 71 Conn. 452.) Underhill, in his work on the Law of Wills (Vol. 1, sec. 343), has summed up the authorities upon the subject as follows : " Clauses by which property is given to A. absolutely, with a limitation over in case A. shall die before receiving his legacy, primarily refer to his death before it is actually received by him in cash, whether he die before or after the death of the testator. Though A. may survive the testator, the legacy to him is contingent upon his surviving to receive it. If the testator expressly directs that the legacy shall be paid at some particular point of future time, as five years from his death, or at the expiration of a life estate, with a gift over in case of the death of the legatee before receiving the legacy, it will vest at the date when it ought to be received, though its actual payment shall be delayed by the caprice or the wilfulness of the executor. The difficulty in construing these limitations over is most striking when they depend upon death simpliciter, without having received the legacy, the testator having omitted all words which would indicate that he meant an actual receipt. In a recent case, where the testator provided that in the event of the death of a remainder-man ' leaving issue before receiving his share, the issue should take,' it was held that a remainder-man who survived the testator took a vested estate at the death of the testator. Receiving here meant possession. The same rule is applied where the will is silent as to the time of payment and the legacy is immediate. Thus, where a legacy is not expressly payable in the future, and the will provides a gift in case of the legatee's death before receiving his share of a residue, or before the ' division ' of the estate, and the legatee survives for one year after the testator, which period is allowed by law for the settlement of the estate, the legacy is indefeasibly vested, though, if he die during the year, the gift over takes effect. The fact that the executor may, if he choose, pay the legacy before the year expires does not accelerate the vesting, for the executor cannot favor one legatee as against another,

Until the year has elapsed the legacy is undoubtedly contingent. And it has been held that equity will not direct that inquiry shall be made into the circumstances of the estate in order to ascertain whether the payment could have been made without inconvenience before the death of the legatee, or within one year from the death of the testator, even if the legatee has survived that period for several years. Cases which provide for a gift over in the event of the death of the legatee before he has actually received a legacy differ radically from those in which an actual receipt is not required. Where it is clearly apparent that the testator intended that the legatee should be at the risk of losing what he gave him through the delay or the caprice of the executor, or through accident, as in case it is expressly provided that if the legatee should die before he shall have ‘actually received his legacy’ the part ‘he has not actually received, whether payable or not,’ is to go to another, the intention must be respected. The gift over is not invalid for its uncertainty, merely because it is within the power of the executor to defeat the intention of the testator respecting it; by a prompt payment of the legacy, if it is clear that the testator intended he should possess that power. Whether the executor shall possess this power depends upon the language of each will. Its existence must clearly appear, as nothing will be taken by implication in this respect.”

The testator’s personal estate, as we have seen, had been distributed, and Frank in his lifetime received his share. The real estate in Virginia had not been sold or converted into money, for the reason that a purchaser could not be found. It is conceded that the sale was made at the earliest date in which it could properly be made. The proceeds could not be distributed until the sale was made and the money received. Had that event occurred during the lifetime of Frank, then it would have become due and payable, and he could have maintained an action therefor. But his death occurred before the happening of that event, and, therefore, the divesting clause of the will became operative, and the share coming to

him under the provisions of his father's will passed to his daughter.

It may be conceded that the English cases are not all in entire harmony. Their chief difference, however, arises out of a diversity in phraseology in the various wills which the courts have been called upon to construe. They all apparently concede that the intention of the testator must control, where the divesting clause is so clearly and specifically stated as to admit of no other construction. Even Lord THURLOW conceded this. But he claimed in the case before him that the testator had not conceived and expressed his intention with such definite certainty that he could act upon it. The great weight of authority, especially the recent cases, support and approve the rule laid down in *Johnson* v. *Crook*, and some of the cases criticise the conclusion reached by Lord THURLOW with reference to the provision being sufficiently definite and certain for him to act upon. It may further be conceded that under the provisions of a will containing a gift over in case of the death of a legatee before payment, that actual payment is not essential in order for it to vest absolutely in a legatee; that under the authority of *Sampson* v. *Sampson* (*supra*) the divesting clause ought not to extend beyond the period in which the legacy is *de jure* receivable, or becomes due and payable, thus avoiding the power of an executor, through delay, caprice or accident, from preventing an absolute vesting of a legacy. With this limitation no reason is apparent, either in law, public policy or morals, why the testator may not make his bequests subject to a provision, clearly and definitely stated, that in case his legatee should die before his legacy become due and payable under the administration of his estate, it shall go over to the child or children of such deceased legatee, and thus prevent its going to the creditors of the legatee or to strangers to the testator or to his blood.

I consequently conclude that Frank took a contingent estate, which would become vested absolutely in case he lived until he was entitled to it in possession, or until it became due and

payable to him, subject to be divested in case of his death before that time, and he having so died, his share passed over to his daughter under the will of his father.

The judgment should be affirmed, with costs.

CULLEN, Ch. J. (dissenting). This action was brought for the construction of the will of Peter S. March, who died in the city of New York on February 11th, 1899. The questions litigated arise under the fifth clause of the will, by which the testator devised the residue of his estate, real and personal, to his executors and trustees in trust:

"*First.* That my Executors and Trustees sell, convey and dispose of the same at public or private sale at such times and on such terms as they may think proper.

"*Second.* That my Executors and Trustees invest and keep invested during the life of my wife one-third part of such residue of my estate, or the proceeds thereof, and pay or apply the rents, interest and income thereof to the use of my wife so long as she shall live.

"*Third.* That my Executors and Trustees divide the remainder of such residue (and on the death of my wife the one-third part held for her benefit) into six equal parts or shares, and convey, pay and assign one of such shares to my son Edwin P. March, first deducting the said sum of Fifteen thousand Dollars as herein directed ; that they convey, pay and assign one other of such shares to each of my sons, Frank P. March and Egbert G. March, absolutely ; that my Executors and Trustees set aside and designate one of the remaining three shares for each of my daughters, Virginia A. March and Laura J. Adams, and son Seth S. March, and hold, invest and keep invested the share of each child last named during his or her life, and collect and receive and pay or apply the rents, interest and income of the share of each child to the use of such child during his or her life, and upon the further trust,

"*Fourth.* That in the event of the death of any of my children before the conveyance and payment to him of the

share of my estate herein given to him, or of either of my children whose share of my estate is held in trust, that my executors convey, pay and assign the share of the one so dying to his or her issue absolutely, and if he or she shall leave no issue, then that they convey, pay, assign and divide such share or the proceeds thereof to and among my surviving children and to the issue of any deceased child, such issue to take by representation the part or share his, her or their parents would have been entitled to, if living."

The testator's wife predeceased him. The testator's son Frank P. March died testate on May 10th, 1900, leaving a widow and daughter, Mary M. Kennedy, his only heir at law and next of kin. Peter March, at the time of his decease, was the owner of real property in the state of Virginia which was not sold by the executors and trustees until after the death of Frank March, but the latter received during his lifetime his share of the other parts of his father's residuary estate. The present contest is between the personal representatives of Frank March and his daughter, Mary Kennedy, and the most important question is as to their respective rights in Frank's share, or what would have been his share had he lived, in the proceeds of the sale of the Virginia property, the personal representatives of Frank claiming it under the third subdivision of the fifth clause of Peter March's will, the daughter claiming under the gift over or substitutional gift contained in the fourth subdivision. As to two propositions there is no dispute: *First*, that the power of sale was mandatory, and hence there was an equitable conversion of the lands in Virginia into personalty; *second*, that under the fourth subdivision, standing alone, Frank would have acquired on the testator's death an indefeasible title to his share of the estate. The respondent, however, contends that the proceeds of the Virginia property not having been paid to Frank, she is entitled under the fifth clause, which directs that in case of the death of any of the testator's children " before the conveyance and payment to him of the share of my estate herein given to him," the executors shall convey, pay and assign

such share to his or her issue.   This branch of the controversy turns wholly on the interpretation to be given to the words "conveyance and payment."   If those words mean the actual payment in hand to the son in money, then the respondent, the daughter, is entitled to the fund, and so the courts below have held.   On the other hand, if, as the appellants contend, the words are to be construed as meaning before the son is entitled to the fund or the same is payable to him, then the fund should be paid to the personal representatives of the son.

While, literally construed, the words would signify actual payment, the results of such a construction have seemed to the courts so unreasonable that they have refused to accord to them that interpretation unless when the intent of the testator has been expressed in language so clear and positive as to leave no room for possible doubt.   The objections to a literal interpretation are that it would not only leave the objects of the testator's bounty subject to accident, which he could in no manner foresee, but also empower those intrusted with the execution of his will to vary or change those objects, at least to some considerable degree, at their own pleasure.   If actual physical transfer of the fund into the hands of the legatee is necessary to constitute payment, in default of which the gift over or substitutional gift takes effect, then any delay in carrying the provisions of the will into execution, any litigation over the probate of the will or as to its assets after probate would divert the testator's property from one channel into another.   These considerations led Lord THURLOW, over a century ago, to reject the literal interpretation, saying : " Suppose he had given a real estate in the manner you specify, it is clear that it will neither depend upon the caprice of the trustee to sell, for that would be contrary to all common sense, nor upon his dilatoriness; in some way it may be sold immediately ; but I should not inquire when a real estate might have been sold with all possible diligence."   The respondents' counsel places great reliance upon the case of *Johnson* v. *Crook* (L. R. [12 Ch. Div.] 639).   There the direction of the will was: " But in case the said Thomas Keeling

shall depart this life before he shall actually have received
the whole of his share   *   *   *   and whether the same shall
have become payable or not, I direct   *   *   *   such part
and parts thereof as he shall not have actually received as
aforesaid, shall be paid, assigned and transferred unto the said
Joseph Gill." In the face of such language there was no
room for doubt as to the intention of the testator. Counsel
for the primary legatee did not question the construction of
the will, but contended the gift over was void for uncertainty,
as whether it took effect or not might depend on the diligence
or dilatoriness of the executor. It was the validity of such a
gift, not the interpretation of the testator's language, that was
considered in that case, and there is nothing contained in the
opinion of the master of the rolls inconsistent with the doc-
trine of the earlier cases. In fact, the master of the rolls con-
cedes the doctrine of those cases as to the interpretation of
such a provision in a will, but contends they are not authority
for the proposition that if the direction of the testator, to
make the gift over depend on the absence of actual payment,
is indisputedly expressed the gift would be void.

The argument of Lord THURLOW is presented in substance
though very much elaborated in *McKinstry* v. *Sanders* (2
Thompson and Cook, 181), which case was affirmed. by this
court on the opinion rendered in the Supreme Court. There
was a direction to sell and convert the real estate, pay debts
and certain legacies, provide for certain annuities, and upon
the settlement of the estate, if it did not exceed the sum of
twenty thousand dollars, pay over the moneys remaining to
the trustees of a church, but if upon settling the estate there
should remain more than twenty thousand dollars, then divide
the excess to the testator's nephews and nieces "who shall
then be living, to be equally divided between them." It was
held that the representatives of the nephews and nieces who
survived the testator, but died before the real estate was con-
verted or the estate settled, were entitled to share in the dis-
tribution. It was there said: "In the case of Mrs. Sanders
(a niece) the property was all in existence when the testator

died, and one year afterward, when she died.  Perhaps, with reasonable expedition in the transaction of the business, the executor may have been able to realize from the real and personal estate, so as to have ascertained what the fund was and have been ready to distribute, if the law would allow such distribution, before her decease.  Can it be said that because this was not done that she lost her right to the legacy, and it never became vested.  I think such a rule would be at war with the intention of the testator, and cannot be upheld upon any legal basis."  Again, in reference to the power of sale, it is said : " Strictly construed, he was also at liberty to wait until all died but himself before making a settlement, and thus secure to himself, if he should survive, the whole estate which remained.  Conceding that this time should be reasonable, and that the executor might be compelled to distribute, by an action at law, still, before the case could be brought to a final determination, some one or more may have died and by the delay have been deprived of the interest intended to be bequeathed.  It cannot be supposed that the testator could have had any intention thus to vest the executor with a power so arbitrary."  All this is equally true of the case before us, and though it is conceded that the executors properly discharged their duties (which was equally the fact in the *McKinstry* case) the question is not what has been done, but what might have been done.

But in my view it is unnecessary to pursue the argument, for in the disposition of this case we are concluded by authority.  In *Finley* v. *Bent* (95 N. Y. 364) the testator directed his executors to convert his real estate, divide the proceeds thereof into shares and invest the same for the benefit of his children, paying the income to them respectively.  At the expiration of one year from his death they were to pay each child out of the principal of his share seven thousand dollars ; at the expiration of two years thereafter five thousand dollars, and at the expiration of five years the remainder of the share.  The will then provided that in case of the death of any child " before the full payment of the whole of his or

her share of such residue" the executors should pay the share of the child, or so much thereof as then remained unpaid, to his or her lawful issue. A child died after the lapse of five years, but the real estate not having been sold at that time, the whole of the share was not received by her. There the contest was, as in the present case, between a grandchild and the representatives of its parent over the proceeds of real estate sold after the parent's death. This court stated the general rule to be: " A limitation over, to take effect in case of the death of the legatee before he has received his share, does not take effect if the legatee lives to become entitled to it, though he die before it has been paid," and held that the representatives of the daughter of the testator were entitled to the fund.

It is urged that the proceeds of the real estate could be payable only after the real estate was sold, because until such sale it was physically impossible there should be any proceeds to pay. This argument overlooks the fact that in law the conversion of the real estate is held to take effect as of the instant of the testator's death, and that when actually made the condition of the proceeds relates back to that time. From the moment of the testator's death the conversion took place and the land became money for all purposes of administration. (*Horton* v. *McCoy*, 47 N. Y. 21; *Fisher* v. *Banta*, 66 N. Y. 468.) Nor is this a mere legal fiction; on the contrary, while the land would descend to the heirs at law subject to the execution of the power, such heirs would take only a naked title, and the rents and profits of the land prior to the sale would go, not to the heirs, but to the legatees of the proceeds of the sale. (*Moncrief* v. *Ross*, 50 N. Y. 431.) Such legatees may, if under no disability, with the concurrence of all, elect to take the land and thus defeat a power of sale. (*Greenland* v. *Waddell*, 116 N. Y. 234.) Therefore, until the exercise of the power of sale the testator's son Frank was the equitable owner of his share of the father's real estate, and the transfer and conveyance to him was immediate on his father's death, by the terms of the latter's

will. Hence, if we look at what may be termed the physical attributes of the property, the only effect of a subsequent sale under the power was to transmute what Frank already possessed as land into money. But the question was in the *Finley* case the same as it is in the present one, and there it was as impossible to physically pay over the proceeds of land as it is here. Nor is there any difference in the provisions of the two wills that affect the question. There the payment and transfer was to be made after the lapse of years; here the gift to the testator's sons ·is immediate, for no formal conveyance by the executors is necessary.

Lastly, it is urged that the construction of the appellants renders the fourth subdivision meaningless or unnecessary. Not so. As to the share of any son dying before the testator, it was intended to vest such share in his issue. It is true that such a provision, in case of the death of a child before the testator, is, under our statute, now unnecessary; nevertheless it is constantly inserted and properly so, because the testator may leave real property in jurisdictions where no such statute exists. Moreover, there was one contingency and that one contemplated by the testator and appearing on the face of his will, in which the provision would be both effective and necessary. Had the testator's widow survived him and any child died before her death, then under this clause such child's share in the trust fund for the widow would go to his issue and not to his personal representatives.

I am of opinion, therefore, that so far as relates to the proceeds of the Virginia real estate the judgment below should be reversed and the fund awarded to the appellants.

A further question was litigated on the trial and has been decided by the judgments below of the rights of the respective parties to share in the trust funds provided for the testator's daughters, in case any such daughter should die without issue; that is to say, whether in such case a share of the fund should be awarded to the appellants or to the respondents. The courts below have held that in that' event the respondent will take. We think this decision correct. There

is no direct gift in such contingency of the remainder of the share, and the general rule is " where the only words of gift are found in the direction to divide or pay at a future time, the gift is future, not immediate; contingent, not vested." (*Matter of Crane*, 164 N. Y. 71; *Matter of Baer*, 147 N. Y. 348; *Rudd* v. *Cornell*, 171 N. Y. 114.) It must be confessed that this rule readily yields to anything in a will which appears to indicate a contrary intention, but in the present case, so far from there being anything in the will to indicate such an intention, the application of the rule harmonizes with the general testamentary scheme that interest should not vest until there is a right of present enjoyment.

The judgments of the Appellate Division and of the Special Term should be modified in accordance with this opinion, with costs to both parties payable out of the fund.

O'BRIEN, VANN and WILLARD BARTLETT, JJ., concur with HAIGHT, J.; WERNER and HISCOCK, JJ., concur with CULLEN, Ch. J.

Judgments affirmed.